IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

Vincent Darnell Sweat,                )        C/A No.: 1:19-3581-SVH
                                       )
            Plaintiff,                 )
                                       )
    vs.                                )
                                       )            ORDER
Andrew M. Saul,                        )
Commissioner of Social Security        )
Administration,                        )
                                       )
            Defendant.                 )
                                       )

     This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Timothy M. Cain, United States District Judge, dated May 21, 2020, referring this matter for disposition. [ECF No. 12]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 11].

     Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied

the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

## I.    Relevant Background

### A.    Procedural History

On March 19, 2015, Plaintiff protectively filed applications for DIB and SSI in which he alleged his disability began on October 1, 2014. Tr. at 141, 142, 256–60, 261–62, 263–71. His applications were denied initially and upon reconsideration. Tr. at 145–46, 177–82. On December 20, 2017, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Linda Diane Taylor. Tr. at 69–91 (Hr'g Tr.). The ALJ issued an unfavorable decision on June 15, 2018, finding that Plaintiff was not disabled within the meaning of the Act.[1] Tr. at 23–45. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on December 30, 2019. [ECF No. 1].

---

[1] The record also contains an unfavorable decision dated May 31, 2018. Tr. at 46–68. The undersigned has compared the findings of fact and conclusions of law in both decisions, and they appear to be the same. *Compare* Tr. at 29–40, *with* Tr. at 51–63. However, the undersigned has not compared the decisions word-for-word. For purposes of review the undersigned has considered and referenced only the June 15, 2018 decision, as it was the ALJ's final decision.

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 42 years old at the time of the hearing. Tr. at 74. He completed high school and a year of college. Tr. at 75. His past relevant work ("PRW") was as a laminator. Tr. at 75. He alleges he has been unable to work since October 1, 2014. Tr. at 261.

2.    Medical History

On October 1, 2014, x-rays of Plaintiff's chest showed no significant cardiopulmonary abnormalities, evidence of fibrosis, or significant lymphadenopathy. Tr. at 405.

Plaintiff presented to rheumatologist Colin C. Edgerton, M.D. ("Dr. Edgerton"), for a consultation on October 9, 2014. Tr. at 400. He complained of a nine-year history of cutaneous sarcoidosis that manifested as a red rash on his face, arms, trunk, and upper legs and affected his lungs. *Id.* He stated a biopsy had confirmed the diagnosis and he had previously been treated with Prednisone. *Id.* He indicated his rash flared when he stopped taking Prednisone. *Id.* He complained of pain in his feet and knees that was worsened by weight-bearing activity and weight gain associated with chronic Prednisone use. *Id.* Dr. Edgerton observed Plaintiff to be obese; to have a diffuse, erythematous, serpiginous papular rash affecting large areas of his arms, trunk, and upper legs; to have stasis dermatitis on the legs; to have

erythematous plaques on his central face, adjacent to the nasal labial folds; to have absent full active range of motion ("ROM") or active synovitis in the bilateral hands; and to demonstrate tenderness to palpation ("TTP") at the medial and lateral joint lines of the bilateral knees. Tr. at 402. He assessed sarcoidosis, rash and other nonspecific skin eruption, lower leg joint pain, and low back pain. Tr. at 403. He stated Plaintiff was suffering side effects from chronic corticosteroid use to include obesity and poorly-controlled type 2 diabetes mellitus ("diabetes"). *Id.* He indicated he would obtain records from Plaintiff's dermatology and pulmonary providers to better assess the extent of involvement of related organs and review lab work. *Id.* He recommended Methotrexate 7.5 mg once a week for two weeks and 15 mg a week thereafter. *Id.* He advised Plaintiff to continue Prednisone until after a follow up visit, but indicated he would consider tapering it down at that time. *Id.* He recommended Plaintiff lose weight through low-impact aerobic exercise and dietary interventions to alleviate mechanical stress on weight-bearing joints. *Id.*

On October 27, 2014, Plaintiff followed up with Dr. Edgerton to discuss diagnostic test results. Tr. at 395. He reported rapid resolution of his skin rash after starting Prednisone, but continued to report some lesions over his shoulders and central face. *Id.* Plaintiff endorsed significant improvement in low back and bilateral knee pain. *Id.* He indicated he was tolerating

Methotrexate. Tr. at 396. Dr. Edgerton observed an erythematous, serpiginous papular rash over Plaintiff's shoulders; stasis dermatitis on his legs; erythematous plaques on his central face, adjacent to the nasal labial folds; a laceration to the right hypothenar eminence with intact sutures; absent full active ROM or active synovitis of the bilateral hands; and TTP at the medial and lateral joint lines of the bilateral knees. Tr. at 397. He instructed Plaintiff to taper down Prednisone by 2.5 mg per week until he discontinued it and to continue Methotrexate 15 mg weekly and folic acid 1 mg daily. Tr. at 398. He stated Plaintiff's bilateral knee pain was likely associated with osteoarthritis, given his positive reaction to Prednisone therapy. *Id.* He advised Plaintiff to engage in low-impact exercise and use dietary interventions for weight loss. *Id.*

On January 26, 2015, Plaintiff reported a rash over his face, arms, and trunk and increased pain in his elbows, hands, wrists, knees, and ankles since stopping Prednisone. Tr. at 390. He felt that Methotrexate was partially controlling the rash. *Id.* Dr. Edgerton observed an erythematous, serpiginous papular rash over Plaintiff's shoulders and arms; stasis dermatitis on his legs; erythematous plaques on his central face, adjacent to the nasal folds; absent full active ROM or active synovitis of the bilateral hands; and TTP at the medial and lateral joint lines of both knees. Tr. at 392. He recommended low-dose Prednisone, but Plaintiff declined to restart steroid therapy. Tr. at

393. Dr. Edgerton recommended Methotrexate 15 mg weekly and noted Plaintiff was to sign up for insurance that he hoped to cover Remicade. *Id.* He ordered blood work. *Id.*

Plaintiff followed up with Dr. Edgerton to review diagnostic test results on March 9, 2015. Tr. at 385. He complained of a continued raised erythematous skin rash over his arms and legs, as well as patches on his face and the right side of his neck. Tr. at 386. He indicated he had stopped taking Methotrexate. *Id.* Dr. Edgerton observed an erythematous, serpiginous papular rash over Plaintiff's shoulders and arms, stasis dermatitis on his legs, and erythematous plaques on his central face, adjacent to the nasal labial folds. Tr. at 387. He noted absent full active ROM or active synovitis of the bilateral hands and TTP at the medial and lateral joint lines of the bilateral knees. *Id.* He recommended continuation of Methotrexate 15 mg weekly and folic acid 1 mg daily and addition of Hydroxychloroquine 200 mg twice daily. Tr. at 388. He advised weight loss through low-impact exercise and dietary interventions to alleviate mechanical stress on weightbearing joints. *Id.*

Two days later, Plaintiff returned to Dr. Edgerton with complaints of blisters on his lips and in his mouth that he developed after taking two doses of Hydroxychloroquine. Tr. at 380. Dr. Edgerton observed Plaintiff to have a few hemorrhagic vesicles over his lower lip and ecchymosis of the bilateral

buccal mucosa. Tr. at 382. He noted an erythematous, serpiginous papular rash over Plaintiff's shoulders and arms, stasis dermatitis on the legs, and erythematous plaques on his central face, adjacent to the nasal labial folds. *Id.* He indicated absent full active ROM or active synovitis of the bilateral hands and TTP at the medial and lateral joint lines of the bilateral knees. *Id.* Dr. Edgerton indicated the blisters were likely a reaction to Hydroxychloroquine and recommended Plaintiff discontinue it and Methotrexate. Tr. at 383. He prescribed Prednisone 20 mg daily for five days. *Id.* He advised Plaintiff to seek emergent care if he developed additional lesions and difficulty swallowing, a feeling of tightness in the throat, or dyspnea. *Id.*

Plaintiff was hospitalized at Colleton Medical Center from March 12 to 15, 2015, for low platelet count secondary to idiopathic thrombocytopenia purpura ("ITP"). Tr. at 644–45. He reported bleeding to his mouth and lip, bruising to all extremities, and dark, tarry stools since the prior day. Tr. at 646. Brian Wyles, NP ("NP Wiles"), observed purpura of the face, ecchymotic lesions of the lips and oral mucosa, and faint systolic murmur. Tr. at 644. Plaintiff received platelet transfusion, intravenous immunoglobulin ("IVIG") therapy, and intravenous steroid therapy. Tr. at 645. Jarrod A. Reynolds, M.D. ("Dr. Reynolds"), instructed Plaintiff to stop Methotrexate, Prednisone 5 mg, and Hydroxychloroquine and to start Prednisone 20 mg twice a day and

to taper down his dose to 20 mg once a day for three days, and 10 mg per day for two days. Tr. at 406. He discharged Plaintiff to his home. *Id.*

Plaintiff followed up with Dr. Edgerton on March 18, 2015. Tr. at 375. Dr. Edgerton noted Plaintiff was obese weighing 290 pounds and having a body mass index ("BMI") of 39.33 kg/m.[2] Tr. at 376, 377. He noted the following abnormalities on physical exam: a few hemorrhagic vesicles over Plaintiff's lower lip and ecchymosis of the bilateral buccal mucosa; absent full active ROM of the bilateral hands; and TTP at the medial and lateral joint lines of the bilateral knees. Tr. at 377. He assessed sarcoidosis, thrombocytopenia, joint pain in the lower leg, and low back pain. Tr. at 377–78. He ordered blood work, held Methotrexate and Hydroxychloroquine, sought approval for Rituximab, and recommended diet and exercise. Tr. at 378. He indicated Plaintiff should continue with the Prednisone taper initiated during his hospitalization. *Id.*

Plaintiff was hospitalized at the Medical University of South Carolina ("MUSC") from March 27 to April 1, 2015, after developing petechiae on his lip and low platelet count. Tr. at 459, 460–61. Ashley Feeman, M.D. ("Dr. Feeman"), ordered IVIG and Prednisone. Tr. at 462–63. Plaintiff consulted with hematologist Charles Steven Greenberg, M.D. ("Dr. Greenberg"), who ordered a second does of IVIG and switched Plaintiff from Prednisone to Dexamethasone 40 mg for four days. Tr. at 466. He also ordered testing for

viral illness and a liver and spleen scan to determine whether splenectomy was required. *Id.* The liver and spleen scan was negative. Tr. at 474. Plaintiff received prescriptions for Coreg 3.125 mg for hypertension and Dexamethasone 4 mg for ITP on discharge. Tr. at 480.

On April 16, 2015, Dr. Greenberg noted no abnormalities, aside from obesity, on physical exam. Tr. at 457. He indicated Plaintiff was responding to Dexamethasone. Tr. at 459. He prescribed Dexamethasone 40 mg for four days, followed by Dexamethasone 4 mg per day for four weeks. *Id.*

On April 20, 2015, Plaintiff presented to Samuel Hunt McNulty, M.D. ("Dr. McNulty"), to establish primary care. Tr. at 455. He reported a history of ITP, sarcoidosis, and hypogonadism. *Id.* Dr. McNulty noted no abnormal findings on physical exam. *Id.* He assessed Prednisone-induced hypogonadism and ordered lab work. *Id.* He prescribed calcium and vitamin D. *Id.*

Plaintiff complained of increased urinary frequency on April 27, 2015. Tr. at 454. Dr. McNulty noted no abnormalities on physical exam. *Id.* He referred Plaintiff to an endocrinologist for primary hypogonadism and prescribed Dexilant for gastroesophageal reflux disease ("GERD"). *Id.* He noted Plaintiff's blood sugar was elevated with hemoglobin A1c of 7.3% and indicated this was likely secondary to steroid use. *Id.* He planned to prescribed Metformin if Plaintiff's steroid use was extended. *Id.*

Plaintiff presented to the emergency room ("ER") at Colleton Medical Center on May 3, 2015. Tr. at 607–12. His blood glucose was initially over 700 mg/dL. Tr. at 608. Justin A. Norris, M.D. ordered insulin, and Plaintiff's blood glucose dropped to the 380s. Tr. at 610. He instructed Plaintiff to take 20 mg of Dexamethasone daily and to follow up with his primary care physician the following day. Tr. at 617.

On May 4, 2015, Plaintiff presented to the ER at MUSC with hypoglycemia. Tr. at 448. He reported his fasting blood sugar that morning was over 300 mg/dL and his blood sugar had been 700 mg/dL on the prior evening. *Id.* He endorsed blurred vision and indicated he had been taking Dexamethasone for ITP. Tr. at 448. David Manning French, M.D. ("Dr. French"), noted Plaintiff had originally been prescribed 40 mg of Dexamethasone with instruction to taper it to 4 mg, but was erroneously taking 20 mg. Tr. at 448–49. Plaintiff weighed 276 pounds. Tr. at 449. Dr. French diagnosed hyperglycemia, oral thrush, and urinary tract infection ("UTI"). Tr. at 450. He discharged Plaintiff with prescriptions for Rocephin and Azithromycin for UTI, Nystatin for oral thrush, and Metformin for diabetes. Tr. at 452.

Plaintiff was hospitalized at MUSC from May 6 to 10, 2015, for hyperglycemia secondary to steroid use. Tr. at 423–24, 432. He presented with complaints of blurred vision and elevated glucose. Tr. at 445. His blood

glucose was greater than 1000 mg/dL upon admission. Tr. at 434. Frank Carter Kurzynske, M.D. noted Plaintiff weighed 258 pounds, appeared dehydrated, and had 4/5 lower extremity strength. Tr. at 445, 446. Plaintiff's hemoglobin A1c was significantly elevated at 11.8%. Tr. at 443. Talat Raja, M.D. ("Dr. Raja"), discharged Plaintiff with instructions to continue to taper off Dexamethasone and to use 45 units of Lantus daily and 18 units of Aspart three times daily. Tr. at 443.

On May 15, 2015, Plaintiff reported his insurance would not cover the pen for Lantus/Aspart. Tr. at 724. He indicated his blood sugars had ranged from the 200s to the 300s. *Id.* Dr. McNulty provided Plaintiff a copay card for the Lantus/Aspart pen and instructed him to attempt to fill it. *Id.* He said he would prescribe regular 70/30 insulin if insurance would not cover it. *Id.* He advised Plaintiff to start Metformin 500 mg, to maintain a blood sugar log, and to return in two weeks. *Id.*

On May 19, 2015, Plaintiff reported he was taking Novolin 70/30 twice a day and experiencing poor vision. Tr. at 711. He indicated his blood sugars were generally in the 200s. *Id.* Dr. Greenberg noted "[h]e clearly cannot tolerate steroids." *Id.* He observed mild gynecomastia, but a physical exam was otherwise normal. Tr. at 713. He indicated Plaintiff required testosterone replacement. *Id.* He recommended Plaintiff taper off steroids and start Rituximab. *Id.* He indicated he might follow it with thrombopoietin therapy.

*Id.* He noted Plaintiff was a candidate for splenomegaly if those measures failed, but was opposed to surgery. *Id.*

Dr. Greenberg completed a physical assessment form on May 21, 2015. Tr. at 604–05. He provided a diagnosis of autoimmune thrombocytopenia. Tr. at 604. He indicated Plaintiff had diabetes, poor vision, bleeding, and dizziness that might impact his capacity for work. *Id.* He noted Plaintiff would need to recline or lie down for periods in excess of normal morning, lunch, and afternoon breaks during an eight-hour workday. *Id.* He stated Plaintiff could walk one block without rest, sit for one hour during an eight-hour workday, and stand/walk for zero hours during an eight-hour workday. *Id.* He indicated Plaintiff would require unscheduled daily breaks for "most of [the] day." *Id.* He estimated Plaintiff could occasionally lift 10 pounds or less, but could never lift greater weight. *Id.* He indicated Plaintiff had difficulties engaging in repetitive reaching, handling, or fingering and could use his bilateral hands, fingers, and arms during 50% of an eight-hour workday. *Id.* He estimated Plaintiff would be absent from work more than four times a month because of his impairments. Tr. at 605.

On May 26, 2015, Plaintiff reported his blood sugars were much better, but complained of sharp right hip pain that worsened with activity. Tr. at 728. Dr. McNulty noted no abnormalities on physical exam. *Id.* He prescribed 50 units of 70/30 insulin twice a day and ordered x-rays of the right hip. *Id.*

Plaintiff presented to Colleton Medical Center with right hip pain on May 28, 2015. Tr. at 698. Merrill C. Ward, M.D. ("Dr. Ward"), noted it was "painful to palpate the entire hip area and to move the r[igh]t hip." Tr. at 700. She assessed painful right hip with osteophyte formation, prescribed Norco, and advised Plaintiff to follow up with the orthopedist as scheduled. Tr. at 700–01.

On June 2, 2015, Plaintiff presented to Jacob M. Drew, M.D. ("Dr. Drew"), for evaluation of left lateral thigh pain and swelling. Tr. at 729. He complained his pain was worse with ambulation. *Id.* He weighed 291 pounds. Tr. at 731. Dr. Drew observed Plaintiff to ambulate with an antalgic gait. *Id.* He indicated Plaintiff had slightly erythematous, warm, and indurated overlying skin of the proximal thigh and significant TTP over the area. *Id.* He also noted significant TTP at the right greater trochanter and painful right-sided straight leg raise. *Id.* Dr. Drew indicated x-rays of the pelvis and right hip showed no significant degenerative changes and well-maintained joint space. *Id.* He assessed painful superficial right lateral thigh mass. Tr. at 732. He considered this area suspicious for infection or abscess given Plaintiff's recent hyperglycemic event. *Id.* He recommended antibiotic treatment after an ultrasound-guided aspiration of the mass with a cell count and cultures. *Id.*

13

Plaintiff followed up with Dr. McNulty the following day. Tr. at 733. Dr. McNulty observed TTP and a large indurate erythematous lesion to the right thigh. *Id.* He prescribed Clindamycin and referred Plaintiff for ultrasound-guided drainage. *Id.*

On June 23, 2015, Plaintiff reported his blood sugars were ranging from the 90s to 100s with use of only Metformin. Tr. at 734. He indicated his right leg pain was significantly decreased with antibiotics. *Id.* He said he had not heard back from the general surgeon about irrigation and debridement of his right thigh abscess. *Id.* Dr. McNulty noted mild induration of the right thigh that was significantly reduced from the prior exam. *Id.* He indicated Plaintiff's abscess was doing much better and extended the course of antibiotics. *Id.* He noted he would follow up with the general surgeon if the abscess failed to resolve following the additional dose of antibiotics. *Id.* He advised Plaintiff to continue to treat diabetes with Metformin. *Id.*

Plaintiff presented to Soonho Kwon, M.D. ("Dr. Kwon"), for evaluation of hypogonadism on June 25, 2015. Tr. at 735. Dr. Kwon ordered multiple tests and advised Plaintiff to return in three-to-six weeks. Tr. at 738.

Plaintiff presented to hematologist Jenny McCallister Riley, M.D. ("Dr. Riley"), on July 1, 2015. Tr. at 714. He reported improved blood sugar after decreasing Dexamethasone from 4 mg to 2 mg daily. *Id.* He indicated he had run out of insulin one month prior, but had continued to check his blood

sugar, which was typically around 100 mg/dL and had been as high as 160 mg/dL. *Id.* He endorsed improved vision. *Id.* Dr. Riley noted Plaintiff weighed 305 pounds, was obese, had trace lower extremity edema, and demonstrated mild bruising in the left antecubital area and hyperpigmentation of the bilateral shins. Tr. at 716. Plaintiff's hemoglobin A1c was elevated at 11.8%. *Id.* His platelet count remained stable. *Id.* Dr. Riley continued Dexamethasone 2 mg daily and advised Plaintiff to continue to obtain a complete blood count weekly. *Id.*

On July 14, 2015, state agency medical consultant Jean Smolka, M.D. ("Dr. Smolka"), reviewed the record and assessed Plaintiff's physical residual functional capacity ("RFC") as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; frequently balance, stoop, crouch, and climb ramps and stairs; occasionally kneel and crawl; never climb ladders, ropes, or scaffolds; and avoid concentrated exposure to extreme heat, wetness, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards. Tr. at 97–100. A second state agency medical consultant, Stephen Burge, M.D. ("Dr. Burge"), assessed the same physical RFC on February 27, 2016. Tr. at 123–26.

On July 16, 2015, Dr. Kwon indicated a biochemical investigation showed primary hypogonadism with low testosterone and high luteinizing

hormone. Tr. at 741. He discussed therapeutic options with Plaintiff, who preferred to proceed with Depo-testosterone 200 mg injections every two weeks. Tr. at 746.

On July 30, 2015, Plaintiff reported his right hip abscess had resolved. Tr. at 746. Dr. McNulty noted no abnormal findings on physical exam. Tr. at 747. He ordered an ultrasound to confirm that the abscess had resolved. *Id.*

On August 12, 2015, Plaintiff reported that he had developed severe back pain that mostly hurt if he walked excessively. Tr. at 717. Dr. Greenberg recorded Plaintiff's weight as 331 pounds. Tr. at 719. He noted weight gain and 1+ bilateral edema. Tr. at 720. He reviewed an ultrasound of Plaintiff's right lower extremity dated August 5, 2015, that showed decreased size of the fluid collection in the soft tissues of Plaintiff's proximal, right thigh. *Id.* Dr. Greenberg felt that Plaintiff had achieved a complete remission from ITP. Tr. at 721. He planned to taper Prednisone to 10 mg every other day, to continue to monitor Plaintiff's platelets weekly, and to add Rituximab if he relapsed. *Id.*

On September 17, 2015, Plaintiff weighed 345 pounds. Tr. at 754. He reported improved symptoms of hypogonadism since starting Depo-testosterone injections. Tr. at 758. Dr. Kwon indicated a testicular ultrasound was unremarkable. *Id.* He addressed Plaintiff's morbid obesity with a BMI of 46 kg/m² and indicated Plaintiff was motivated for weight control. *Id.*

Dr. Greenberg observed Plaintiff to have a skin rash on December 15, 2015. Tr. at 958. Plaintiff reported he typically developed a rash if his Prednisone dose was lower than 20 mg. *Id.* Dr. Greenberg noted Plaintiff was trying to work out and that his diabetes was controlled with Metformin. Tr. at 959. Plaintiff weighed 326 pounds. Tr. at 960. Dr. Greenberg declined to perform a full physical exam, but noted Plaintiff's skin was likely affected by sarcoid on his arms and the mid-level of his thighs. Tr. at 961. He stated Plaintiff's ITP was under control with a low-dose steroid. *Id.* He prescribed Prednisone 20 mg every other day to treat Plaintiff's rash. *Id.* Dr. Greenburg wrote a letter stating it was his medical opinion that Plaintiff was "currently disabled due to a combination of sarcoidosis and chronic ITP" and "needs chronic treatment for both of these conditions which interfere with daily life." Tr. at 760.

Plaintiff underwent pulmonary function testing on January 20, 2016, that showed restriction with reduced diffusing capacity of the lungs for carbon monoxide ("DLCO"). Tr. at 1147–48. His forced expiratory volume in the first second ("FEV$_1$") of 2.6 was 68% of normal. *Id.* His forced vital capacity ("FVC") of 3.27 was 70% of normal. *Id.* His DLCO of 24.6 was 64% of normal. *Id.*

State agency consultant John Petzelt, Ph.D. ("Dr. Petzelt"), reviewed the record and completed a psychiatric review technique on January 27,

2016. Tr. at 122. He determined Plaintiff had established no medically-determinable mental impairment. *Id.*

On February 25, 2016, Plaintiff received his first dose of Remicade without adverse reaction. Tr. at 971. He returned for a second Remicade infusion on March 10, 2016, and was ordered to return for a third infusion and lab work in four weeks. Tr. at 978–79. Plaintiff subsequently followed up for Remicade infusions every six weeks throughout 2016 and 2017 and into 2018. Tr. at 991–1082, 1087–93, 1118–23, 1129–34, 1151–60.

On March 15, 2016, Plaintiff reported Remicade had improved his skin. Tr. at 986. Dr. Greenberg observed improved warm, dry lesions on Plaintiff's skin and 1+ edema, but no other abnormalities on physical exam. Tr. at 988. He indicated Plaintiff's ITP appeared to be in remission. *Id.*

Plaintiff underwent pulmonary function testing again on September 6, 2016, that showed restriction with reduced DLCO. Tr. at 1147–48. His $FEV_1$ of 2.17 was 57% of normal. *Id.* His forced FVC of 2.77 was 59% of normal. *Id.* His DLCO of 26.4 was 69% of normal. *Id.*

Plaintiff repeated pulmonary function testing on April 11, 2017, and it showed mild restriction based on spirometry with normal DLCO. Tr. at 1147–48. He demonstrated $FEV_1$ of 2.63, which was 73% of normal. *Id.* His forced FVC of 3.18 was 73% of normal. *Id.* His DLCO of 34.2 was 93% of normal. *Id.*

On July 20, 2017, Plaintiff presented for a Remicade infusion, but the treatment was held because his liver function tests showed elevated liver enzymes. Tr. at 1085. Pulmonary disease specialist Walter Ennis James, IV, M.D. ("Dr. James"), referred Plaintiff for a right upper quadrant abdominal ultrasound that showed hepatomegaly, but was otherwise normal. Tr. at 1084. The next day, Dr. James recommended Plaintiff proceed with his next Remicade infusion in a week or two, provided the lab work showed improvement. *Id.*

On October 11, 2017, Dr. James, completed a physical impairment questionnaire. Tr. at 763–64. He stated he had treated Plaintiff for sarcoidosis every three months. Tr. at 763. He identified Plaintiff's symptoms as rash, shortness of breath, leg swelling, and cough. *Id.* He stated Plaintiff's symptoms were frequently severe enough to interfere with the attention and concentration required to perform simple work-related tasks. *Id.* He noted Plaintiff's medications caused fatigue. *Id.* He confirmed that Plaintiff would need to recline or lie down in excess of the normal 15-minute morning and afternoon and 30- to 60-minute lunch breaks during a typical eight-hour workday. *Id.* He estimated Plaintiff could walk one city block without rest or significant pain; sit for 30 minutes at a time; stand/walk for five minutes at a time; and sit for one hour and stand/walk for one hour in an eight-hour workday. *Id.* He indicated Plaintiff would require unscheduled breaks every

30 minutes that would last for 20 minutes. *Id.* He stated Plaintiff could occasionally lift 10 pounds or less, but could lift no greater weight or perform frequent lifting. Tr. at 764. He indicated Plaintiff had limited ability to engage in repetitive reaching, handling, or fingering. *Id.* He noted Plaintiff could use his bilateral hands and fingers for 20% of an eight-hour workday and his bilateral arms for 10% of an eight-hour workday. *Id.* He estimated Plaintiff would be absent from work more than four times a month because of his impairments or treatment. *Id.* He opined that Plaintiff was not capable of working eight hours a day and five days a week on a sustained basis. *Id.* Dr. James noted he had treated Plaintiff since January 2016 and considered the limitations and restrictions to be applicable since that time. Tr. at 765.

Plaintiff reported stable breathing and no significant cough or wheezing on January 22, 2018. Tr. at 1145. He complained of a slight increase in the skin lesions on his arms, but noted they had improved with steroid creams. *Id.* He said he was exercising more and losing weight, but reported his chronic knee pain was exacerbated by exercise. *Id.* He endorsed ongoing lower extremity edema, rare paroxysmal nocturnal dyspnea, and two-pillow orthopnea. *Id.* He denied eye complaints. *Id.* He weighed 323 pounds and had a BMI of 46.46 kg/m.² Tr. at 1147. Dr. James observed Plaintiff to appear obese, to have 1+ bilateral lower extremity edema, and to have small scattered papules on both arms that had worsened since his last

20

visit and unchanged facial lesions that had improved with Remicade. *Id.* He explained that Plaintiff had gained 130 pounds and developed diabetes since he was initially diagnosed with sarcoidosis via skin biopsy in 2004. Tr. at 1144–45. He indicated Plaintiff's skin disease had stabilized and his skin lesions had improved somewhat since he started Remicade in January 2016. Tr. at 1145. He continued Remicade, but indicated Plaintiff's Remicade drug and antibody levels should be checked prior to his next infusion given his inability to wean Prednisone use below 10 mg every other day. Tr. at 1150. He stated Plaintiff's edema was possibly related to pulmonary hypertension and indicated he would get a repeat echocardiogram and pursue right heart catheterization. *Id.* He prescribed medication for chronic arthritis and instructed Plaintiff to take Motrin as needed. *Id.* He indicated Plaintiff likely had sleep apnea, but could not afford an office-based or home sleep study. *Id.* He completed a short-term disability form, but stated he discussed with Plaintiff that "it should be our goal for him to return to work." *Id.* He instructed Plaintiff to follow up in three months. *Id.*

  C. The Administrative Proceedings

    1. The Administrative Hearing

      a. Plaintiff's Testimony

At the hearing on December 20, 2017, Plaintiff testified he had a driver's license and drove to the store and the pharmacist. Tr. at 74. He said

he lived with his mother, who was retired. Tr. at 75. He stated he last worked in 2014, when he was laid off from his job after missing multiple days. *Id.* He said he worked as a laminator for three boat companies over the course of a 13-year period. *Id.*

Plaintiff testified he experienced good and bad days. Tr. at 76. He admitted he could work on a good day, but described flare-ups in which he experienced pain and fatigue that required he lie down all day. *Id.* He stated his flare-ups lasted for three-to-four days at a time and occurred every two weeks. *Id.* He said they were characterized by breakouts on his arms and in his respiratory system, swelling in his knees, and a lot of pain. *Id.* He described shortness of breath, sinus and head swelling, a dry cough, and itchy, dry eyes. Tr. at 77. He said he developed lesions on his skin during flares. Tr. at 78. He indicated he treated his symptoms with Prednisone, an inhaler, and a nebulizer. Tr. at 76–77. He stated he received Remicade infusions for four hours, every six weeks. Tr. at 78–79. He described sleeping for the remainder of the day and moving slowly and feeling sluggish for two-to-three days. Tr. at 79. He said he watched television during flares, but did not go out in public because of his skin lesions. Tr. at 80.

Plaintiff testified he was attempting to lose weight to better control his diabetes. Tr. at 79. He said his legs sometimes swelled. *Id.* He stated he had

to avoid sweet and fried foods. *Id.* He said he tried to exercise, but could not walk too much and was not following a particular workout plan. Tr. at 80.

Plaintiff testified he had difficulty sitting for long periods and could only sit for 15 to 30 minutes at a time on a good day. *Id.* He said his ankles swelled when he walked and prevented him from standing for long. *Id.* He suspected either the sarcoidosis or his weight caused the swelling. *Id.* He estimated he could walk half a block. *Id.* He said he could lift 30 to 40 pounds on a good day, but did not lift on bad days. Tr. at 82.

Plaintiff testified he would lie around on bad days. Tr. at 80. He said he typically spent his days reading, watching television, and using the computer, but could not strain his eyes for long periods. Tr. at 81. He stated he cared for one dog. *Id.* He said he had difficulty managing his personal needs at times. *Id.* He denied doing laundry and indicated his mother did it. Tr. at 81–82.

Plaintiff testified he last experienced a sarcoidosis flare two weeks prior that has lasted for a week. Tr. at 82. He admitted it was a particularly bad flare. *Id.* He said he had experienced flares since 2014. *Id.*

Plaintiff stated Dr. Greenberg had treated him for ITP that went into remission in March 2016. Tr. at 83. He said he followed up with Dr. Greenberg a couple more times over the following year, but had stopped

seeing him. *Id.* Plaintiff stated Dr. James continued to treat his sarcoidosis. *Id.*

Plaintiff testified he was taking Prednisone 5 mg every other day when he was not experiencing a flare. *Id.* He said he increased his dose to 10 mg during flares. *Id.* He said he was taking a decreased dose of Prednisone because it made him gain weight and damaged his bones and joints. *Id.* He also felt that Prednisone caused him to have more frequent mood swings, during which he wanted to be alone and not to talk. Tr. at 84.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Tonetta Watson-Coleman reviewed the record and testified at the hearing. Tr. at 86–90. The VE categorized Plaintiff's PRW as a laminator, *Dictionary of Occupational Titles* ("*DOT*") No. 806.684-054, as requiring medium exertion as described and medium-to-heavy exertion as performed, and having a specific vocational preparation ("SVP") of 4. Tr. at 87. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work with frequent climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; frequent stooping and crouching; occasional kneeling and crawling; and no concentrated exposure to humidity, cold, heat, fumes, odors, dust, gases, or hazards. Tr. at 87–88. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 88. The ALJ asked whether there were any other jobs

in the national economy that the hypothetical person could perform. *Id.* The VE identified light jobs with an SVP of two as a ticket seller, *DOT* No. 211.467-030, a work ticket distributor, *DOT* No. 221.667-010, and a ticket taker, *DOT* No. 344.667-010, with 3.4 million, 307,000, and 110,000 available positions, respectively. *Id.*

The ALJ next described an individual of Plaintiff's vocational profile who was limited as described in the first question, but was further limited to sedentary work. *Id.* He asked if the individual could perform Plaintiff's PRW. *Id.* The VE testified that he could not. *Id.* The ALJ asked if there were any jobs in the national economy that such a person could perform. *Id.* The VE identified sedentary jobs with an SVP of 2 as a document preparer, *DOT* No. 249.587-018, a food and beverage order clerk, *DOT* No. 209.567-014, and a charge account clerk, *DOT* No. 205.367-014, with 2.9 million, 180,000, and 181,000 available positions, respectively. Tr. at 88–89.

For a third hypothetical question, the ALJ asked the VE to consider an individual of Plaintiff's vocational profile who was limited as described in the second question and would be absent from work more than two days per month because of medical conditions. Tr. at 89. The ALJ asked if the individual would be able to perform Plaintiff's PRW or any other jobs in the national economy. *Id.* The VE testified that the individual would be unable to obtain or maintain employment. *Id.*

The ALJ asked the VE if Plaintiff's PRW resulted in any transferable skills to light or sedentary work. *Id.* The VE stated it did not. *Id.*

Plaintiff's attorney clarified that an individual who would be absent from work three days per month would be unable to perform work at any exertional level. Tr. at 90. The VE stated she was providing her opinion as to time off-task based on her professional experience. *Id.* She testified that anyone off-task for greater than 10 percent of the workday would be unable to maintain work. *Id.*

### 2.    The ALJ's Findings

In her decision dated June 15, 2018, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.
2.    The claimant has not engaged in substantial gainful activity since October 1, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.    The claimant has the following severe impairment: sarcoidosis (20 CFR 404.1520(c) and 416.920(c)).
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except, he is further limited by the following: frequently climbing stairs and ramps; never climbing ladders, ropes and scaffolds; frequently stooping and crouching; occasionally kneeling and crawling; avoiding concentrated

exposure to humidity, fumes, odors, dusts and gases; and avoiding exposure to hazards.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on July 3, 1975 and was 39 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2014, through the date of this decision (20 CR 404.1520(g) and 416.920(g)).

Tr. at 29–40.

II.  Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)  the ALJ rejected Plaintiff's complaints for improper reasons and failed to adequately evaluate his subjective allegations;

2)  the ALJ erred in assessing diabetes and obesity as non-severe impairments;

3)  the ALJ did not properly analyze whether sarcoidosis met or equaled a listing;

4)  the ALJ failed to properly weigh Plaintiff's treating physician's opinions;

5)      ALJ cherrypicked normal findings, materially misstated the record, and did not consider all of Plaintiff's restrictions in assessing his RFC.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as he actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a)(b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a

party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.,* *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should

the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Consideration of Subjective Allegations and Mischaracterization of Record

Plaintiff argues the ALJ erred in using his "inconsistent steroid use" to discount his subjective allegations where the record established valid reasons for his cycling on and off steroids. [ECF No. 13 at 15]. He maintains the ALJ penalized him based on socioeconomic barriers to care. *Id.* at 15–16. He contends the ALJ did not consider the comprehensive record in evaluating his subjective allegations. *Id.*

The Commissioner argues the ALJ's evaluation of Plaintiff's subjective complaints is supported by substantial evidence. [ECF No. 14 at 14].   He maintains the ALJ relied "primarily" on "a lack of documented functional limitations in the record, to find that Plaintiff was not as limited as he alleged." *Id.* at 15. He contends the ALJ cited unremarkable physical examinations and assessed an RFC that accounts for Plaintiff's functional limitations as established in the record. *Id.*

"[A]n ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)). "First, the ALJ looks for objective medical evidence showing a condition that

could reasonably produce the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. § 404.1529(b)). If the ALJ finds the claimant's impairments could reasonably produce the symptoms he alleges, she proceeds to the second step in which she "evaluate[s] the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit [his] ability to perform basic work activities." *Id.* (citing 20 C.F.R. § 404.1529(c)).

The ALJ must "evaluate whether the [claimant's] statements are consistent with objective medical evidence and the other evidence." SSR 16-3p, 2016 WL 1119029, at *6. However, she is not to evaluate the claimant's symptoms "based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled." *Id.* at *4. The ALJ is directed to consider other evidence that "includes statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in [the] regulations." *Id.* at *5; *see also* 20 C.F.R. §§ 404.1529(c), 416.929(c) (listing factors to consider, such as ADLs; the location, duration, frequency, and intensity of pain or other symptoms; any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms).

Pursuant to SSR 16-3p, the ALJ is to explain which of the claimant's symptoms she found "consistent or inconsistent with the evidence in [the] record and how [her] evaluation of the individual's symptoms led to [her] conclusions." SSR 16-3p, 2016 WL 1119029, at *8. "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Lewis*, 858 F.3d at 869 (quoting *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010)). She must evaluate the "individual's symptoms considering all the evidence in his or her record." SSR 16-3p, 2016 WL 1119029, at *8.

The ALJ summarized Plaintiff's testimony as to the frequency of his flare ups, his treatment, and his activities and abilities on good and bad days. Tr. at 32. She found Plaintiff's "impairment could reasonably be expect to cause the alleged symptoms," but his "statements concerning the intensity, persistence, and limiting effects of these symptoms" were "not entirely consistent with the medical evidence and other evidence in the record." *Id.* She noted physical and objective exams had "failed to establish the limitations alleged." Tr. at 33. She stated Plaintiff was typically treated with low-dose steroids with remission of skin findings and discussed otherwise unremarkable findings throughout the record. *Id.*

She further wrote the following:

34

> Finally, in evaluating this claim under 16-3p, the undersigned finds the claimant's allegations regarding his symptoms are not generally consistent with the record as a whole. Regarding his activities of daily living, the claimant indicated the ability to care for his personal needs and hygiene, and he indicated that he is able to take his medication on his own. He performs household chores such as ironing, making his bed, sweeping and dusting and prepares his own meals. He also takes care of his dog. He said he goes outside two times a day and is able to go out alone and travels by driving a car. The claimant testified that he drives when he needs to, approximately two to three times a day. He shops for food, and goes to church. He reads the Bible, and magazines, researches on the internet, and plays video games and does these things well and every day. He said he could walk a half mile and would need to rest five minutes before resuming. He can follow written and spoken instructions (Exhibit 9E, 4E, Hearing Testimony). Thus, his reported activities of daily living require physical abilities, which are generally inconsistent with his reported functionality.

Tr. at 35.

The ALJ rejected Plaintiff's allegation that he experienced flare ups every two to three weeks that lasted four or more days because "there are no noted flares in the record, other than those noted above, between October 2014 and March 2015, and not again until December 2015, each time due to a reduction in his prednisone." Tr. at 36. She stated the record showed stability and improvement in Plaintiff's condition since starting Remicade. *Id.*

The ALJ further wrote the following:

> More generally, the undersigned notes inconsistent use of steroids throughout the record and large gaps in the treatment record, suggesting the claimant's symptoms might not be as severe as alleged. While the undersigned is cognizant that there might have been some issues related to insurance, he did not seek no-cost treatment alternatives, such as treatment at a public

health clinic. It is also worth noting that in March 2015, the claimant said that he was going to start working again (Ex. 1F/15) which is generally inconsistent with this allegation that he is incapable of working. For these reasons, and others stated in this decision, the undersigned finds the claimant's allegations as to his symptoms are generally inconsistent with the record as a whole.

*Id.*

The ALJ's evaluation of Plaintiff's subjective allegations does not reflect her comprehensive review of the record, as required pursuant to SSR 16-3p. She cited Plaintiff's "inconsistent use of steroids throughout the record" as a reason to reject his subjective allegations. Tr. at 36. However, this reason is not justified, as the ALJ neglected to consider the significant side effects imposed by steroid use or to note that Plaintiff generally followed his physicians' instructions as to use of steroids. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

The record reflects some positive symptom resolution with steroids, but negative long-term effects that Plaintiff's providers attempted to reduce, including diabetes and weight gain that led to morbid obesity and exacerbated osteoarthritis. *See* Tr. at 400 (reflecting Plaintiff's complaint that weight gain caused by Prednisone use caused pain in his feet and knees that was worsened by weight-bearing activity), 403 (noting Plaintiff was suffering side effects from chronic corticosteroid use to include obesity and diabetes), 1144–45 (noting Plaintiff had gained 130 pounds and developed

diabetes since he was initially diagnosed with sarcoidosis and initiated steroid therapy). It shows a cycle of steroid reduction leading to increased symptoms of sarcoidosis followed by additional steroids leading to exacerbation of other conditions.

In October 2014, Dr. Edgerton prescribed Methotrexate and, later that month, advised Plaintiff to taper off steroids. Tr. at 398, 403. However, when Plaintiff followed up in late-January 2015, he declined to restart Prednisone, despite having developed a severe rash and increased pain in his joints. Tr. at 390, 393. Plaintiff continued to demonstrate significant symptoms of sarcoidosis in March 2015, and Dr. Edgerton prescribed Hydroxychloroquine in addition to Methotrexate. Tr. at 388. Plaintiff developed blisters and followed up two days later. Tr. at 382. Blood work showed a low platelet count, and he was hospitalized for ITP. Tr. at 644–45. He was discharged on steroid medications, Tr. at 406, but was prescribed a different steroid during a second hospitalization from March 27 to April 1, 2015. Tr. at 459, 460–61. Plaintiff followed up with Dr. Greenberg, who prescribed more steroid medication on April 16, 2015. Tr. at 459. It appears Plaintiff misunderstood Dr. Greenberg's dosage instructions and took an excessive dose of the steroid, leading to two emergency room visits and a four-day hospitalization for hyperglycemia in May 2015. *See* Tr. at 423–24, 432, 448–52, 607–12. Dr. Raja advised Plaintiff to taper off the steroid and prescribed insulin. Tr. at 443. At

a follow up appointment, Dr. Greenberg indicated Plaintiff could not tolerate steroids, Tr. at 711, and his blood sugar improved after he discontinued them. *See* Tr. at 714, 728, 734. However, by December 2015, Plaintiff developed a more significant rash despite taking a low-dose steroid for ITP, and Dr. Greenburg increased his dose of Prednisone. Tr. at 958. Plaintiff reported improved symptoms of sarcoidosis after initiating Remicade infusions in February 2016 and continuing them every six weeks thereafter. Tr. at 991–1082, 1087–93, 1118–23, 1129–34, 1151–55. On January 23, 2018, Dr. James indicated Plaintiff's sarcoidosis had stabilized, but he had been unable to wean Prednisone use below 10 mg every other day.[4] Tr. at 1145, 1150.

The ALJ also erred in discounting Plaintiff's subjective allegations based on "large gaps in the treatment record." Tr. at 36. A "claimant may not be penalized for failing to seek treatment she cannot afford; 'it flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him.'" *Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1985) (quoting *Gordon v. Schweiker*, 725 F.2d 231, 237 (4th Cir. 1984). Although the ALJ was "cognizant that there might have been some issues related to insurance,"

---

[4] Because the record contains only diagnostic testing and procedural notes from Remicade infusions between March 2016 and January 2018 and lacks treatment notes from Dr. McNulty after July 2015 and from any other provider from March 2016 until January 18, it is not clear what effect Plaintiff's prescribed steroid use had on his diabetes, osteoarthritis, or any other comorbidity after July 2015.

she discounted Plaintiff's allegations because "he did not seek no-cost treatment alternatives, such as treatment at a public health clinic." Tr. at 36. She reached this conclusion without questioning Plaintiff as to efforts he had undertaken to obtain free or low-cost treatment. *See generally* Tr. at 74–82, 84. This court has generally ordered remand where ALJs used claimants' lack of treatment to discount their subjective allegations, but failed to adequately address whether the claimants could afford additional treatment. *See Sox v. Astrue*, C/A No. 6:09-1609-KFM, 2010 WL 2746718, at *13 (D.S.C. Aug. 24, 2016) (directing the ALJ on remand to "not draw any negative inferences about the plaintiff's symptoms and their functional effects from her irregular medical visits without first considering her explanation and the evidence that supports it"); *Dozier v. Colvin*, C/A No. 1:14-29-DCN, 2015 WL 4726949, at *4 (D.S.C. Aug. 10, 2015) (finding the ALJ erred in evaluating the plaintiff's subjective allegations where he noted there were low cost agencies that could provide treatment without making specific factual findings as to the sources available to her and whether her failure to seek additional treatment was based on her alleged inability to pay); *Gadsden v. Colvin*, C/A No. 4:12-2530-DCN, 2014 WL 368216, at *4 (D.S.C. Feb. 3, 2014) (finding remand was warranted because the ALJ's analysis of the plaintiff's credibility relied heavily on her limited medical treatment history without adequately addressing whether she could afford to pay for other medical treatment).

Thus, the ALJ rejected Plaintiff's subjective allegations based a gap in his medical treatment without undertaking the necessary inquiry.

Moreover, the record suggests Plaintiff obtained additional treatment that is not reflected in the record. Dr. James's January 2018 treatment note references Plaintiff's first visit in January 2016. Tr. at 1144. Despite Dr. James's reference to examining Plaintiff every three months since January 2016, Tr. at 763, and citation of prior treatment visits, the record does not contain notes from any of Plaintiff's other visits with Dr. James. Plaintiff also completed an undated recent medical treatment form in which he referenced visits to Dr. McNulty on August 17, 2016, Dr. Kwon on March 17, 2016, and Dr. James on May 3, 2016. Tr. at 361. The record fails to include treatment notes from any of these visits. Counsel at the administrative level neglected his duty as Plaintiff's advocate and erred in neglecting to provide these records for the ALJ's review. However, 20 C.F.R. § 404.1512(b) and § 416.912(b) provide that the Social Security Administration ("SSA") "will make every reasonable effort to help [the claimant] get medical evidence from [his] own medical sources and entities that maintain our medical sources' evidence when [he] give[s it] permission to request the reports." Plaintiff's completion and submission of the recent medical treatment form placed the ALJ on notice that additional records likely existed. See Tr. at 361. He also completed a form authorizing his medical providers to disclose information to

the SSA. *See* Tr. at 373. Thus, the ALJ's neglect of her duty under 20 C.F.R. § 404.1512(b) and § 416.912(b) likely contributed to the "large gaps in the treatment record," Tr. at 36, she referenced as supporting her rejection of Plaintiff's allegations.

The ALJ's reference to a March 2015 treatment note in which Plaintiff "said that he was going to start working again" does not support her rejection of Plaintiff's subjective allegations. As discussed above, Plaintiff developed ITP and required three hospitalizations following his report to Dr. Edgerton that he planned to return to work. Plaintiff protectively filed for benefits following his first hospitalization. Tr. at 141, 142, 256–60, 261–62, 263–71. He subsequently developed an abscess that caused additional complications, struggled with prescribed steroids, experienced waxing and waning symptoms of sarcoidosis, and began Remicade infusions. Given the evidence of record, substantial evidence does not support the ALJ's rejection of Plaintiff's allegations based on his plan to return to work before he developed additional complications.

Given the foregoing errors, the court finds substantial evidence does not support the ALJ's evaluation of Plaintiff's subjective allegations as to the disabling effect of his impairments.

2.     Additional Allegations of Error

Plaintiff alleges the ALJ also erred in evaluating the severity of his impairments, determining whether his impairments met or equaled a listing, weighing the medical opinions, referencing the evidence of record, and accounting for his symptoms in the RFC assessment. [ECF Nos. 13 and 15]. The Commissioner disputes Plaintiff's arguments and maintains the ALJ's findings as to each issue were supported by substantial evidence. [ECF No. 14]. Given the evidentiary gap discussed above, the court is ill-equipped to address Plaintiff's additional allegations of error and, therefore, declines to do so. On remand, Plaintiff's counsel and the SSA are ordered to fulfill their respective duties to ensure the record contains all relevant medical records.

III.     Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

July 20, 2020                                Shiva V. Hodges
Columbia, South Carolina                    United States Magistrate Judge